IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
WICHITA FALLS DIVISION

PERCY FOREMAN,                          )
TDCJ #926545,                           )
        Plaintiff,                     )
                               )          Civil Action No. 7:07-CV-151-O
v.                                      )
                               )
TEXAS TECH, *et al.*,                   )
        Defendants.                    )

MEMORANDUM OPINION AND ORDER

Came on this day to be considered *Defendants Potter and Green's Motion for Summary Judgment and Brief in Support* (Docs. No. 59-60), *Plaintiff's Motion for Summary Judgment and Affidavit and Exhibits* (Docs. No. 69-71) and Plaintiff's *Declaration in Opposition to Defendants' Motion for Summary Judgment*, and the Court finds and orders as follows:

This is an action brought pursuant to 42 U.S.C. § 1983 by an inmate who, at the time of the events giving rise to this lawsuit, was confined in the Allred Unit of the Texas Department of Criminal Justice ("TDCJ") in Iowa Park, Texas.  Defendants are Dr. David Potter, a physician employed at the Allred Unit, and Sgt. Andrew Green, a correctional officer at the Allred Unit. *Complaint ¶ IV.B.*  Plaintiff claims that Dr. Potter denied him proper medical care for a fractured ankle and that Sgt. Green failed to protect him from an attack by his cellmate which resulted in the fractured ankle.  *Id. at ¶ V.*  He seeks $2,000,000.00 in monetary damages and injunctive relief.  *Id.*

Plaintiff's Allegations

Plaintiff's alleges that Defendant Green failed to take steps to protect him from an attack by his cellmate, Larry Norwood, who is a gang member. *Complaint ¶ V.*  Plaintiff claims to have been attacked by gang members in the past. *Id.*  He alleges that he notified Sgt. Green that Norwood had

threatened him, that a fight was imminent and that he feared an attack by Norwood. *Id.* Plaintiff states that, on or about March 5, 2007, Sgt. Green coerced him into signing "a waiver" and intimidated him into returning to the cell. *Id.* Plaintiff claims that, on March 10, 2007, he endured a vicious attacked by his cellmate during which he suffered a broken ankle, a broken nose, a cut on his face and other minor injuries. *Id.*

Immediately after the attack, Plaintiff was transported to the United Regional Health Care Systems Hospital for evaluation and treatment. *Id.* Plaintiff claims that, upon his return to the Allred Unit, Dr. Potter failed to provide him with crutches and delayed the surgery necessary to repair his ankle for eleven days. *Id.* On March 21, 2007, Plaintiff and Dr. Potter had a "telemed" conference with an orthopaedic surgeon who recommended that surgery be done the next day. *Id.* Plaintiff claims that Dr, Potter's intentional delay of surgery resulted in infection and has caused him to "walk funny." *Id.*

<u>Failure to Protect</u>

To establish a civil rights claim against a prison official for failure-to-protect, a plaintiff "must show that he is incarcerated under conditions posing a substantial risk of serious harm and that prison officials were deliberately indifferent to his need for protection." *Neals v. Norwood*, 59 F.3d 530, 533 (5th Cir. 1995) (citing *Farmer v. Brennan*, 511 U.S. 825, 834 (1994)). "Deliberate indifference" is a subjective standard which occurs only where a prison official knows of and disregards a substantial risk to the inmate's health or safety. *Farmer*, 511 U.S. at 837. Deliberate indifference thus requires that "the [offending] official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Neals*, 59 F.3d at 533 (quoting *Farmer*, 511 U.S. at 837).

On March 2, 2007, pursuant to Plaintiff's complaint regarding threats of violence by his cellmate, an investigation was initiated. *Defendants' Motion For Summary Judgment, Appendix C at pp. 149-150 (hereinafter "Defendants' Appendix ___ at p. ___ .").* The investigator was Defendant Green who completed a Pre-Investigation Worksheet on March 2, 2007. *Id. at p. 151.* On the worksheet, Defendant Green states the nature of the allegation which is "offender's cellie threatened him with violence." *Id.* Green's summary of the investigation states that "offender Foremen has been threatened by offender Norwood due to offender Norwood wanting to dominate the use of the cell. They have since come to an agreement to share the cell and no longer have dislike for one and the other. There is no need for an offender protection at this time." *Id.* Plaintiff's statement along with his signature, also appears on the Pre-Investigation Worksheet. Plaintiff states, "offender Norwood my cell (sic) had threatned (sic) me with vilance (sic) but we have since called a true (sic) with each other and my life is not in dager (sic) at this time." The worksheet was also signed by a witness and reviewed and signed by Major Berger. *Id.* The next communication from Plaintiff to prison officials that appears in the record of this case is an "I-60[1]" from Plaintiff regarding the attack by his cellmate on March 10, 2007. *Id. at p. 152.*

Shortly after the attack by Norwood, an Offender Protection Investigation was conducted. *Id. at pp. 153-156 & 158-159.* The investigation revealed that Foreman and Norwood each had 4 major and 2 minor disciplinary actions in the proceeding 12 months, that neither offender was associated with a security threat group (gang), and that the Plaintiff, Percy Foreman, had a history of being assaultive toward staff and other offenders. *Id. at p. 157.* As a result of the fight, Norwood was moved to administrative segregation and Foreman was moved to the infirmary. *Id.* It was

---

[1] An "I-60" is an informal written communication from an inmate to prison officials.

decided that the two would not be housed in the same building for several months. *Id.* The report indicates that, other than his complaint of threats on March 2, 2007 and his interview with Defendant Green, Foreman did not complain of threats of violence to any other prison staff member. *Id.*

In his Declaration in Opposition to Defendants' Motion for Summary Judgment (Doc. No. 76), Foreman claims to have given Defendant Green a second I-60 communication on March 4, 2007 alleging danger of attack by his cellmate which he claims was *after* he had signed the waiver acknowledging that his cellmate was no longer a threat. *Plaintiff's Declaration in Opposition at p. 2.* Plaintiff argues that this second I-60 put Green on notice that there was a threat of danger and that Green's failure to act renders him liable. In support of this claim, Plaintiff cites Exhibit E. *Id.* Review of Plaintiff's Declaration reveals Exhibits A through D, but no Exhibit E. Review of the record in this case does not reveal any I-60 communication sent to Defendant Green after Plaintiff signed the waiver stating that there was no longer a threat.

It is noteworthy that, in his complaint, Plaintiff states Defendant Green coerced him into signing a waiver and left him in his cell on or about March 5, 2007. *Complaint p. 7.* In his answers to the Court's questionnaire, Plaintiff states that he filed a life endangerment claim on March 3, 2007 and that Defendant Green waited until March 5, 2007 to investigate. *Plaintiff's Answer to the Court's Question No. 12.* Plaintiff states that he signed the waiver that day, on March 5, 2007, out of fear instilled in him by Sgt. Green. *Id.* Neither in his complaint nor in his answers to the Court's questions does Plaintiff indicate that he submitted a second I-60 to Green warning of a threat after signing the original waiver indicating that his cellmate was no longer a threat. Moreover, Plaintiff has failed to submit evidence of any such communication. Simply put, the record in this case belies Plaintiff's claim that Defendant Green was deliberately indifferent to his need for protection.

-4-

<u>Denial of Medical Care</u>

Next Plaintiff seeks redress from Defendant Potter for failing to provide medical care and for intentionally delaying medical care for the fractured ankle he suffered during the fight with his cellmate. *See Complaint.* In order to state a colorable claim for the denial of medical care under the Eighth Amendment, "a prisoner must allege acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs." *Estelle v. Gamble*, 429 U.S. 97, 106 (1976). "Deliberate indifference" under the Eighth Amendment occurs only where a prison official subjectively knows of and disregards a substantial risk to the inmate's health or safety. *Farmer v. Brennan*, 511 U.S. 825, 837 (1994); *Hare v. City of Corinth, Miss.*, 74 F.3d 633, 650 (5th Cir. 1996). A delay in medical care can rise to the level of a constitutional violation if the delay results in substantial harm. *Mendoza v. Lynaugh*, 989 F.2d 191, 195 (5th Cir. 1993); *Wesson v. Oglesby*, 910 F.2d 278, 284 (5th Cir. 1990). However, it is well established that negligent or erroneous medical treatment or judgment does not provide a basis for a § 1983 claim. *Graves v. Hampton*, 1 F.3d 315, 319 (5th Cir. 1993). As long as jail medical personnel exercise professional medical judgment, their behavior will not violate a prisoner's constitutional rights. *See Youngberg v. Romeo*, 457 U.S. 307, 322-23 (1982). A disagreement over the appropriate medical treatment constitutes, at most, a possible claim of medical malpractice appropriately addressed under state law. *E.g., Estelle v. Gamble*, 429 U.S. at 107-08; *Varnado v. Lynaugh*, 920 F.2d 320, 321 (5th Cir. 1991); *Fielder v. Bosshard*, 590 F.2d 105, 107 (5th Cir. 1979).

Defendants concede that Plaintiff suffered a fractured right ankle during the altercation with his cellmate. *Brief in Support of Defendants Potter and Green's Motion for Summary Judgment p. 3 (hereinafter "Defendants' Brief at p. ___ .").* However, they argue that "Plaintiff received

immediate and continuous medical treatment for his injuries sustained during the altercation, by
Defendant Dr. Potter and numerous other medical professionals at the Allred and Montford Units
and at the United Regional Healthcare Systems, and Dr. Potter did not intentionally delay the
scheduling of Plaintiff's ankle surgery." *Defendants' Brief at p. 9.*   The Court has reviewed
Plaintiff's medical records.  A summary of his medical records for the time period relevant to the
issues in this lawsuit is aptly set forth by Defendants as follows:

> At approximately 5:40 a.m., on Saturday, March 10, 2007, Plaintiff was brought to the
> infirmary at the Allred Unit after being involved in an inmate altercation. *Appendix A* at p.2.
> Plaintiff was noted to have lacerations and abrasions to his face and swelling to his right
> ankle. *Id.*  An ice pack was applied to his face and ankle and transportation was ordered to
> take Plaintiff to United Regional Health Care Systems (URHCS) for evaluation.  *Id.*
> Plaintiff was admitted into URHCS at approximately 8:41 a.m. *Id.* at p. 3.

> At URHCS, Plaintiff was diagnosed with a laceration to the eyelid and a bimaleolar fracture
> to his ankle; he received sutures for the laceration and his ankle was splinted.  *Appendix A*
> at pp. 5-6, 8-13.  Plaintiff was advised to wear the splint, keep the leg elevated, apply ice
> packs, and follow up with an orthopedic surgeon, and then he was discharged to return to the
> Allred Unit.  *Id.* at 6.

> Upon returning to the Unit from URHCS, Plaintiff was admitted into the infirmary at
> approximately 11:56 a.m. on March 10, 2007. *Appendix A* at p.14.  The nurses on duty on
> that Saturday insured that he was to receive Tylenol #3 every four (4) to six (6) hours as
> needed, his ankle was to be iced every two (2) hours for twenty (20) minutes for twenty-four
> (24) hours and Plaintiff was to be seen for followup by Dr. Potter on Monday, March 12,
> 2007. *Id.* On March 10th and 11th, 2007, Plaintiff was monitored by medical personnel on
> a regular basis; he was administered Tylenol #3 and encouraged to stay off his leg and keep
> it elevated.  *Appendix A* at pp.15, 19.

> On March 12, 2007, Plaintiff was seen by Dr. Potter at approximately 10:20 a.m., while Dr.
> Potter was doing his inpatient infirmary rounds. *Appendix A* at p. 20.  At that time, Plaintiff
> told Dr. Potter he has a prior history of a left foot drop and is unable to use his left foot, but
> on further examination by Defendant Potter, it was determined that Plaintiff had some use
> of the left foot though he is unable to dorsi-flex the foot normally. *Id.*  Dr. Potter noted that
> Plaintiff had been seen at URHCS and had three (3) diagnoses, including a Bi-malleolar
> fracture of the right ankle, and that Plaintiff's right ankle was splinted. *Id.*  Dr. Potter
> ordered that the right ankle be x-rayed the next day. *Id.*

Plaintiff remained in the infirmary from March 11, 2007 until March 20, 2007, where he was monitored everyday by medical personnel, and was allowed the use of a wheelchair when necessary to move, such as going to the shower. *Appendix A* at pp.15-17; 21-27. On March 20, 2007, Plaintiff received a fracture boot and an x-ray to his right ankle. *Id.* at pp.26-27,29. On March 21, 2007, Plaintiff orthopedic tele-medicine consultation with Dr. [G]ill. *Id.* at pp. 28, 31. Dr. Gill recommended that Plaintiff be scheduled for surgery as soon as possible. *Id.* Dr. Potter received Dr. Gill's plan recommendation and in turn ordered that Plaintiff be transferred to the Montford Unit for fixation of the ankle fracture that day or as soon as van arrangements could be made. *Id.* at 32. Dr. Potter also prescribed Plaintiff Tylenol #3 for three (3) days for pain management. *Id.*

Plaintiff was transported and admitted to the Orthopedics Clinic at the Montford Regional Medical Facility ("RMF") in Lubbock, Texas on March 21, 2007. *Appendix A* at pp. 33-40. Plaintiff underwent surgery on his ankle on March 22, 2007, and was placed in a cast post-operative. *Id.* at pp. 44-57. The doctor's post-operative surgery orders were for Plaintiff to use crutches for the next six (6) weeks, keep the leg elevated, and use ice packs on the leg for the next twenty-four (24) hours. *Id.* at p.54. Plaintiff remained at RMF until April 9, 2007, where he continued to receive monitoring and care, including a post-operative x-ray prior to being returned to Allred. *Id.* at pp. 18, 58-72.

On April 10, 2007, Plaintiff was seen in the medical department at Allred by Physician's Assistant ("P.A.") Wilson, and was given plastic bags and tape to cover his cast with while showering until the cast was removed. *Appendix A* at p.73. On April 16, 2007, Plaintiff was seen by P.A. Doty, who noted that Plaintiff had a handicap cell and recreational restrictions, and that Plaintiff's previous orthopedics note indicated crutches. *Id.* at p. 74. P.A. Doty ordered that Plaintiff be scheduled for an orthopedic follow-up in six (6) weeks. *Id.* at p. 74.

From April 24, 2007, to July 18, 2007, Plaintiff is seen approximately six (6) times by various Allred medical staff, but not Defendant Dr. Potter, for issues relating to his right ankle. *Appendix A* at pp. 75-86. During these visits, Plaintiff receives trash bags to cover his cast, prescriptions for pain, and an ankle brace. *Id.* On July 18, 2007, Plaintiff is seen by an orthopedic doctor, Dr. Gill, via tele-medicine and Dr. Gill orders that Plaintiff get a new x-ray on the ankle and begin personal strengthening exercises on the ankle; P.A. Wilson insures that Dr. Gill's orders are placed in the clinic ordering system. *Id.* at pp.86-87.

On July 24, 2007, Plaintiff receives an x-ray to his right ankle. *Appendix A* at p.88-89. The radiology report notes that the "bone density appears satisfactory", "[a]nkle mortis does not appear frankly remarkable," and "surrounding soft tissues do not appear frankly remarkable" and that nothing has "significantly changed in appearance." *Id.* On August 6, 2007, Plaintiff is seen by P.A. Doty for chronic ankle pain. *Id.* at p. 90. P.A. Doty orders that Plaintiff be scheduled for Physical Therapy for rehabilitation to Plaintiff's right ankle. *Id.*

On September 1, 2007, Plaintiff is seen in the medical clinic to turn in his crutches and for complaints of drainage to the pin site of his right ankle. *Appendix A* at p.93. A culture is

taken of the drainage, Plaintiff is given a "lay-in" or pass to return to medical on September 4, 2007 to be seen by a higher level medical provider, and is given bandages for dressing changes. *Id.* Plaintiff returns to the medical clinic on September 4, 2007, where his ankle is examined by P.A. Doty. *Id.* at p. [94]. P.A. Doty notes that offender is a very familiar visitor to the clinic, assesses a cutaneous sore, and orders that triple antibiotics be applied to the site and that Plaintiff receive daily nurse dressing changes for five (5) days. *Id.*

On September 10, 2007, Plaintiff is brought into the medical clinic by two other offenders after he claims that he slipped and fell in the chow hall and cannot walk on his right leg. *Appendix A* at pp. 96-99. Plaintiff receives ibuprofen and crutches; Plaintiff is able to use the crutches without assistance. *Id.* at 96-100. Later in the same day, despite having already received ibuprofen, Plaintiff complains that he should receive something for pain. *Id.* at p. 99. When Plaintiff does not receive immediate medication, the clinic staff notes that he became angry, rose smoothly from his chair and walked out of the clinic in a fast but steady manner on his crutches. *Id.* Despite Plaintiff's disruptive behavior, clinic staff order that Plaintiff's nortriptyline be increased and schedule him for a followup appointment with a provider the next day. *Id.*

On September 11, 2007, Plaintiff is seen by P.A. Doty in the medical clinic for his lower leg infection. *Appendix A* at p. 101. P.A. Doty assesses a superficial staph infection that he notes is healing well with Bactrim therapy, and chronic ankle pain. *Id.* P.A. Doty notes that Plaintiff refused Naproxen and Ibuprofen and when Plaintiff became angry he was asked to leave the clinic. *Id.* Nonetheless, P.A. Doty orders that Plaintiff receive an x-ray to his ankle. *Id.* This x-ray is performed on September 12, 2007, and the diagnostic radiology report notes "[r]ight ankle shows healed impacted fracture to the posterior calcaneus" and "[n]o recent fracture or dislocation is noted." *Id.* at p. 102.

On September 18, 2007, Plaintiff is seen by clinic personnel to get his ankle wound dressing changed. *Appendix A* at pp. 103-105. Nursing staff note that wound is scabbed over and there are no signs of infection, and she schedules Plaintiff for a follow-up with a higher-level provider and gives him ibuprofen. *Id.* at p. 103. Plaintiff is seen by P.A. Doty on September 21st and 24th, 2007 for ankle pain and wound care. *Appendix A* at pp. 106-107. Plaintiff is given 800 mg of Ibuprofen, after stating he just wants another pain medication, and is told to continue with his wound care. *Id.*

From September 27, 2007 to October 26, 2007, Plaintiff receives physical therapy for his right ankle at the Montford RMF. *Appendix A* at pp.108-116. At Plaintiff's last physical therapy session on October 26, 2007, the physical therapist observes that Plaintiff's use of single crutch should be discontinued as he is able to ambulate without significant abnormality. *Id.* at p.116. During November 2007, Plaintiff is seen four (4) times by medical personnel at the Allred Unit concerning either ankle pain or a knot on his lower right leg. *Id.* at pp.117-124. A culture is taken of the knot, Plaintiff receives medication and daily nurse dressings to care for the wound, and another ankle xray. *Id.* In December 2007,

Plaintiff is seen twice by medical personnel, and is issued a single crutch and pass. *Id.* at pp.126-127.

Finally, in January 2008, Plaintiff is seen by medical personnel on approximately five (5) different occasions for complaints regarding his ankle, including Defendant Dr. Potter on January 16, 2008. *Appendix A* at pp. 128-137. During his medical visit on January 10, 2008, Plaintiff indicates that his back and ankle pain is onset by changes in the weather and by standing for long periods of time. *Id.* at p.129. On January 16, 2008, Plaintiff is seen by Defendant Dr. Potter as Plaintiff claims that he must have a special medical order regarding handcuffing as Plaintiff uses a crutch. *Id.* at p.134. Defendant Dr. Potter notes that Plaintiff is extremely argumentative during the visit, will not allow Dr. Potter to express his opinion, and is only attempting to force Dr. Potter to order the pass that Plaintiff feels he needs. *Id.* Dr. Potter notes that Plaintiff's fracture is over 10 months old, and Plaintiff has full flexibility of the ankle. *Id.* Defendant Potter also notes that Plaintiff is escorted everywhere he goes and that the security officer is there to help him balance and attempt to prevent Plaintiff from injuring himself, thus no change in restraint protocol is necessary. *Id.*

*Defendants' Brief at pp. 9-14.*

The medical records clearly show that Plaintiff was seen, evaluated, and treated multiple times for the injury to his ankle. The summary judgment evidence indicates that Plaintiff was not denied medical care, rather, he disagrees with the nature of the care provided. Such a disagreement does not rise to the level of a constitutional violation.

Plaintiff complains of the ten-day delay of the surgery on his foot from March 12, 2007, when he was first seen by Dr. Potter, until March 22, 2007, when the surgery was performed, has resulted in physical harm. *Plaintiff's Answer to the Court's Question No. 3; Plaintiff's Motion for Summary Judgment at p. 4.* Specifically, Plaintiff claims that the delay of surgery has resulted in pain and swelling in his ankle, difficulty walking, permanent deformity and disfigurement, infection and improper healing. *Id.* Plaintiff argues that Dr. Potter's intentional delay in obtaining surgery for the ankle constitutes deliberate indifference to his serious medical need. *Plaintiff's Motion for Summary Judgment at p. 4.*

The summary judgment evidence reflects that Plaintiff had a follow-up visit with the orthopaedic department at the Montford Unit on May 17, 2007. *Defendant's Appendix A at p. 80.* X-rays were taken that day which revealed "satisfactory healing." *Id. at p. 81.* The cast was removed and Plaintiff was instructed to begin gradual resumption of weight bearing on the ankle over several weeks. *Id.* The doctor ordered a telemedicine clinic visit in six weeks. *Id.* On July 24, 2007, x-rays were taken which demonstrated satisfactory bone density, mild degenerative changes, unremarkable soft tissue appearance and no significant changes in appearance of Plaintiff's ankle. *Id. at p. 88.* While it appears that Plaintiff suffered some swelling and infection in his ankle six months after the surgery, *id. at pp. 93-101*, it also appears that his visit to the medical department for treatment was occasioned by a slip and fall in the chow hall. *Id. at p. 97.* In short, Plaintiff has presented no arguments or evidence which could demonstrate that the ten-day delay in obtaining the ankle surgery resulted in the conditions he describes. To the extent, if any, that plaintiff states a claim for medical negligence, such a claim does not rise to the level of a constitutional violation.

<u>Summary Judgement Standard</u>

Summary judgment is proper when the pleadings and evidence illustrate that no genuine issue exists as to any material fact and that the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c)(2); *Slaughter v. Southern Talc Co.*, 949 F.2d 167, 170 (5th Cir. 1991). Disputes concerning material facts are genuine if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Douglass v. United Servs. Auto. Ass'n*, 79 F.3d 1415, 1429 (5th Cir. 1996) (en banc) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). Substantive law provides that an issue is "material" if it involves a fact that might affect the outcome of the suit under the governing law. *Anderson*, 477 U.S. at 248; *Burgos v. Southwestern Bell*

*Telephone Co.*, 20 F.3d 633, 635 (5th Cir. 1994).  The nonmovant is not required to respond to the motion until the movant properly supports his motion with competent evidence.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Tubacex, Inc. v. M/V Risan*, 45 F.3d 951, 954 (5th Cir. 1995). However, once the movant has carried his burden of proof, the nonmovant may not sit idly by and wait for trial.  *Page v. DeLaune*, 837 F.2d 233, 239 (5th Cir. 1988).

When a movant carries his initial burden, the burden then shifts to the nonmovant to show that the entry of summary judgment is inappropriate.  *Celotex*, 477 U.S. at 322-24; *Duckett v. City of Cedar Park, Tex.*, 950 F.2d 272, 276 (5th Cir. 1992).  Although the nonmovant may satisfy this burden by tendering depositions, affidavits, and other competent evidence, "conclusory allegations, speculation, and unsubstantiated assertions are inadequate to satisfy the nonmovant's burden," *Douglass*, 79 F.3d at 1429, as the opposing party's response must "set out specific facts showing a genuine issue for trial."  Fed. R. Civ. P. 56(e)(2).  Merely colorable evidence or evidence not significantly probative, however, will not defeat a properly supported motion for summary judgment.  *Anderson*, 477 U.S. at 249-50.  Furthermore, a mere scintilla of evidence will not defeat a motion for summary judgment.  *Anderson*, 477 U.S. at 252; *Davis v. Chevron U.S.A., Inc.*, 14 F.3d 1082, 1086 (5th Cir. 1994).

Summary judgment evidence is viewed in the light most favorable to the party opposing the motion.  *Matsushita Elec. Indus. Co., Ltd., v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Rosado v. Deters*, 5 F.3d 119, 123 (5th Cir. 1993).  In addition, factual controversies are resolved in favor of the nonmovant, but only when both parties have submitted evidence of contradictory facts, thus creating an actual controversy.  *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (en

banc). In the absence of any proof, however, the Court does not assume that the nonmovant could or would prove the necessary facts. *Id.*

In making its determination on the motion, the Court looks at the full record including the pleadings, depositions, answers to interrogatories, admissions, and affidavits. Fed. R. Civ. P. 56(c)(2); *Williams v. Adams*, 836 F.2d 958, 961 (5th Cir. 1988). However, "the [Court's] function is not [ ] to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249. The movant's motion for summary judgment will be granted if he meets his burden and the nonmovant fails to make the requisite showing that a genuine issue exists as to any material fact. Fed. R. Civ. P. 56(e)(2).

The summary judgment evidence presented in the instant case establishes that there are no genuine issues of material fact and that Defendants are entitled to summary judgment as a matter of law.

For the foregoing reasons, it is ORDERED that *Defendants' Motion for Summary Judgment* is GRANTED, *Plaintiff's Motion for Summary Judgement* is DENIED, and the complaint is hereby dismissed with prejudice pursuant to 28 U.S.C. § 1915(e)(2)(B)(i) as frivolous.

The Clerk of Court shall transmit copies of this order to Plaintiff and to Counsel for Defendants.

SO ORDERED this 20th day of October, 2009.


Reed O'Connor
**UNITED STATES DISTRICT JUDGE**